**James G. JANDRAIN, Appellant,**

v.

**John S. LOVALD, Trustee, Appellee.**

**No. CIV 06–1015.**

United States District Court,
D. South Dakota,
Central Division.

Aug. 22, 2006.

Stan H. Anker, Anker Law Group, P.C., Rapid City, SD, for Plaintiffs.

Frederick M. Entwistle, Woods, Fuller Schulz & Smith, P.C., Sioux Falls, John Scott Lovald, Olinger, Lovald, Robbennolt, McCahren & Reimers, P.C., Pierre, SD, for Defendants.

KORNMANN, District Judge.

[¶ 1] This case concerns a timely appeal of right from a final order of a bankruptcy judge; jurisdiction exists by virtue of 28 U.S.C. § 158(a).

[¶ 2] Tri–State Ethanol Company, LLC ("Tri–State"), filed a Chapter 11 bankruptcy petition. Tri–State was a manager-managed company as distinguished from a member-managed company. One of the items listed in the bankruptcy schedule of Tri–State was an expected claim on behalf of James G. Jandrain ("Jandrain") for director fees (somewhat imprecisely called since Jandrain was a member of the board of managers of the LLC) of $3,900.00. Jandrain filed no proof of claim until after the case was converted to a Chapter 7 filing. Jandrain then filed a claim for $53,327.50, which included the director fees of $3,900.00. The bankruptcy trustee, John S. Lovald, raised questions, was not satisfied with the response and the itemized billing statement from Jandrain, and then objected to the proof of claim, # 394. Bankruptcy Judge Hoyt held a contested hearing on the objections on May 4, 2006, and entered an order sustaining the objections on May 5, 2006. The order was, although quite informally, supported by findings of fact and conclusions of law, the judge stating at the hearing that the brief filed by the trustee accurately stated the facts and the conclusions of law and that he was adopting the same. The judge also found that the claim should be rejected because of inadequate records and documentation.

[¶ 3] Many facts are undisputed. Jandrain was a member of the board of managers, the managing body of Tri–State. He was and is a C.P.A. from Omaha, NE. He claims to have performed miscellaneous services, most by way of accounting, for Tri–State. All services for which a claim is now being made were performed during the time that he was serving on Tri–State's board of managers and while he was a member, officer, and investor in Tri–State.

[¶ 4] Jandrain did not submit invoices (even preliminary or informative invoices) to Tri–State or bill it at all for the compensation now sought until after the bankruptcy conversion to Chapter 7. Jandrain claims he was paid by Tri–State for services previously performed though November 30, 2001. The trustee claims such services were performed for another entity, Tri–State Corn Processors. Such question is immaterial for the reasons that will be explained. The first meeting of the board of managers was on January 4, 2001.

[¶ 5] Tri–State made no mention in its bankruptcy filing of debts owed to Jandrain for accounting or related services. This is despite the fact that Jandrain assisted Tri–State in compiling the information for the bankruptcy filing. Jandrain had no agreement with Tri–State as to how they would distinguish services for which he could submit a bill as distinguished from services provided as a member of the board or as a corporate officer. There was no agreed upon rate of compensation between Jandrain and Tri–State. Although Jandrain was specifically delegated part of the responsibility of negotiating with the insurance company for Tri–State after an explosion and fire damaged the Tri–State plant, no rate or amount of compensation was even discussed. Not

even the fact of some anticipated compensation was discussed or negotiated. All members of the board of Tri–State were providing valuable services of one kind or another, as rather extensively reflected by board minutes. They were trying to keep Tri–State financially afloat.

[¶ 6] The board minutes report rather extensive discussions in detail by members of the board of managers about compensation to be paid by Tri–State for particular items or to particular persons. Again, there was never any discussion on the record about any compensation to Jandrain, either as to the fact, the amount, or the method of calculation. There is nothing in Tri–State records showing an account payable to Jandrain for services. Normal rules of bookkeeping or accounting would require such items to be reflected and reported so that any person dealing with Tri–State would know the financial situation of Tri–State. Otherwise, creditors and others would be misled as to the financial condition; they would not know what debts Tri–State had incurred. Any C.P.A. would know the importance of the company books and records being accurate, complete, and not misleading. Tri–State was required by SDCL 47–34–11(4) to have at its principal place of business copies of its financial statements for the three most recent years. The record does not reflect whether this was done. Apparently, however, it is undisputed that no financial statement disclosed any debts to Jandrain for services.

[¶ 7] Other facts are undisputed. At a board meeting of January 4, 2001 (a meeting at which Jandrain was elected treasurer of Tri–State), there was discussion about an accountant for Tri–State. Jandrain stated "that he would act as the working CPA, to help set up the books, etc., but we will need an independent CPA for a yearly review ..." A mere statement by a board member that he will volunteer to do something does not constitute formal action or an agreement by Tri–State to compensate Jandrain. At a board meeting of April 9, 2001, it is stated that Jandrain will file an extension to permit a late filing with the Internal Revenue Service. There was a discussion of Tri–State owing $12,000.00 to Walter Woods for services and c. $5,500.00 in attorney fees. Again, there was no discussion of any bills owed or to be owed to Jandrain. At a board meeting of October 29, 2001, there was discussion of a "package" from Doherty Employment Services to handle all the human resource and payroll needs of Tri–State and Jandrain requested that he be sent a copy of the "package." There was no mention of what he was to do with the "package."

[¶ 8] At a board meeting of May 18, 2002, the minutes reflect the following: "Motion by Mark Luitjens any payment for services rendered by anyone will have to be approved by board. Kim Buchanan added anyone approved for services will have to submit purchase order or itemized bill. Seconded by Dave Rosenkranz-motion carried." Jandrain was absent from this meeting and we do not know whether or when he was furnished with a copy of the minutes and this corporate policy. At a board meeting of December 27, 2002, the minutes state: "Some of our investors may be will (sic) to give up some tax credits if Jim Jandrain could structure a plan to present them with ways to save money by showing a loss. Jim could possibly work with David Oneill (sic)." There was no directive to Jandrain to do anything or any indication as to who would pay for his services. There is nothing to indicate what Jandrain did to "structure a plan."

[¶ 9] At a board meeting of January 3, 2003, the minutes state: "... also Randy would like the board to delegate authority

to Dave R and [Jandrain] to work with our insurance company." Further: "[Jandrain] will be the lead person to work with insurance company responding to our claims etc. negotiate and report back to the board for full approval." Further: "Randy has some reservations about if we are working as a board to manage the plant. The consensus was that we were." The clear implication of the preceding quotation was that board members were going far beyond normal board responsibilities and were engaged in what would normally be executive functions.

[¶ 10] At a board meeting of May 19, 2003, the minutes state: "The Omaha Investor Group's representative managers will be Dave Ruback, [Jandrain], Bernie Marquart." The record does not tell us what the Omaha Investor Group was or why Jandrain would have been a "representative manager" for such "group." The record does not reflect what, if any, compensation Jandrain was receiving from the Omaha Investor Group.

[¶ 11] Jandrain, in replying to the request of the trustee for documentation and further information, sent a letter of November 3, 2005. He states that he did not submit invoices to Tri–State on a regular basis. He states he always intended to bill for his services, but it was a "question of timing." He states: "I did not expect to be paid until the plant was performing profitably (or, in this case, sold at a profit)." Obviously, the plant was never performing profitably. There is nothing in the record before this court to indicate that the plant or Tri–State was ever sold "at a profit." By his own admission, Jandrain did not expect to be paid and was taking his chances. By his own admission, all his claims for compensation were contingent only. There is no evidence that any contingency was fulfilled. Even if there was no contingency, Jandrain has many other legal problems in connection with his claim.

[¶ 12] An examination of the Jandrain billing statement shows that it is impossible to "sort out" what services were performed as a C.P.A., what services were performed as a representative of the Omaha Group, what services were performed as a prudent investor, what services were performed as an elected board member, and, although not discussed by Judge Hoyt, what services were performed as treasurer of Tri–State. Obviously, an officer, especially the treasurer, of a corporation, has more extensive duties and responsibilities than simply a board member. The described services are very broad and provide almost no detail. The vast majority of the services appear to be far beyond what would be expected of a C.P.A. and have nothing to do with accounting. That certainly includes negotiations with an insurance company about claims on behalf of Tri–State. Such services sound more like the practice of law than of accountancy. I fully recognize, of course, that negotiations did involve computations of claimed loss of revenue.

[¶ 13] For the most part, there is no explanation as to where the services were provided. Some services were clearly provided in South Dakota. There is nothing in the record to show that Jandrain was licensed to perform services as a C.P.A. in any state, including South Dakota. There is nothing to show that Jandrain complied with SDCL 36–20B–67 which would have required him to notify the licensing board of his intention "to enter the state under this provision completing procedures and paying fees specified by the board and promulgated by rule pursuant to chapter 1–26." In the absence of such compliance, it is obvious that he could not legally perform C.P.A. services in South Dakota. Jandrain testified that he worked as the

"plant accountant." The minutes reflect that he made many trips to South Dakota to conduct business. All of this only adds additional support to the finding that Jandrain has failed to submit adequate proof and explanations.

[¶ 14] There is nothing in the record as to how the business of a limited liability company must be conducted under South Dakota law. SDCL 47–34A–112(b)(9) tells us that Tri–State was empowered to: "Elect managers and appoint officers, employees, and agents of the limited liability company, define their duties, fix their compensation . . ."

[¶ 15] SDCL 47–34–19, the original limited liability company chapter, provides: "The contributions to capital of a member to the limited liability company may consist of cash or property or services rendered but neither promissory notes nor future services shall constitute the contribution of any member." The Uniform Limited Liability Company Act found at Chapter 47–34A applies to all limited liability companies in existence after January 1, 2004. SDCL 47–34A–401 provides: "A contribution of a member of a limited liability company may consist of tangible or intangible property or other benefit to the company, including money, promissory notes, services performed, or other agreements to contribute cash or property, or contracts for services to be performed." This is very broad language indeed. Without some agreement in writing, it would be impossible to determine whether the services performed or to be performed by Jandrain would constitute additional contributions to capital.

[¶ 16] SDCL 47–34–23(*l* ) tells us that no member such as Jandrain "may receive out of limited liability company property any part of his contribution to capital" until all liabilities of the limited liability company, except liabilities to members on account of their contributions to capital, have been paid or there remains property of the limited liability company sufficient to pay them.

[¶ 17] SDCL 47–34A–403(d) provides: "A member is not entitled to remuneration for services performed for a limited liability company, except for reasonable compensation for services rendered in winding up the business of the company." The source of this code section is the Session Laws of 1998, chapter 272, § 403. Reading this section would or should set off alarms in connection with any member such as Jandrain planning to provide services for compensation for Tri–State.

[¶ 18] We know also that SDCL 47–34A–409(f) provides: "A member of a member-managed company may lend money to and transact other business with the company. As to each loan or transaction, the rights and obligations of the member are the same as those of a person who is not a member, subject to other applicable law." Tri–State, however, as already discussed, was not a member-managed company; it was a manager-managed company. If the legislature intended to authorize what Jandrain did, it would have included a manager-managed company in SDCL 47–34A–409(f).

[¶ 19] There is no real need here to interpret these various statutes but a casual reading of them would or should have alerted Jandrain as to the significant legal difficulties and perils of a member of the board of managers and a corporate officer providing accounting services for Tri–State and expecting to be compensated for the services. At a minimum, the statutes would or should have caused Jandrain to seek legal advice before performing any services for which he expected compensation. Jandrain apparently proceeded blindly at his own peril.

[¶ 20] This court is not lacking in sympathy for the plight of Mr. Jandrain. He obviously did render very valuable services. He probably went far beyond the call of duty. He did an excellent job of negotiating with Tri–States' insurance company. He, however, has fallen into or jumped into a trap, entirely of his own making. Many attorneys and C.P.A.'s participate as corporate officers or members of a board of directors, especially after having invested in a business venture. Such persons comprise the most valuable board members (and officers) because of the education and experience brought to the table. Other non-professional officers and directors look to these professionals for a great deal of advice and guidance. Any attorney or C.P.A. must be very careful to not cross the line of ethical constraints about being involved in a business relationship with a client. Conflicts of interest are sometimes presented and not easily avoided. If there is ever a time for a professional board member or officer to see to the preparation of proper board minutes and documentation, i.e. meeting all formalities of doing business as a corporation and being careful to comply with all laws, it is when the licensed professional is seeking to represent a client with whom the professional is also involved in a business relationship. Proper disclosures and disclaimers should be made and documented in writing. Written retainers with a clear understanding of the nature of the services to be performed and the compensation to be paid for such services are almost essential, if not absolutely required. Common sense tells us that C.P.A.'s routinely send to any client (even those with whom the C.P.A. has no outside business relationship) explanations and disclaimers. Here, we have none of any of this.

[¶ 21] Jandrain has failed to meet his burden of proof to show any express contract between Jandrain and Tri–State. He has also failed to meet his burden of showing an implied contract. There is no evidence as to any hourly rate, the duration of the services, the extent of the services, or evidence sufficient to "sort out" what services were provided in what capacity. There is nothing to even indicate that a customary hourly rate was to be paid. There is no reference to "reasonable accounting fees." Violations of state law may have occurred.

[¶ 22] The claimed ratification is without legal effect. The majority of the board members (who were no longer in control of Tri–State or its finances) had no legal authority to ratify anything. Having filed for bankruptcy which was converted to a Chapter 7 bankruptcy, the management and control of Tri–State passed to the trustee. *See* 11 U.S.C. §§ 704 and 323. There was, in addition, nothing to ratify since there was no contract in existence.

[¶ 23] As to the claim for recovery in quantum meruit, this is an equitable doctrine. Under all the facts as found by the bankruptcy court and by this court, the court declines to order recovery under quantum meruit. Jandrain comes to this matter with unclean hands, so to speak. He was no stranger as to what is required of corporations in taking actions. He failed to do what was required of him and failed to see that Tri–State did what was required of it. He paid apparently no attention to a number of statutes of this state. In addition, Jandrain seeks to recover in violation of expressed written corporate policy of which he knew or should have known. It would be inequitable under all the facts to permit Jandrain to make any recovery under quantum meruit.

[¶ 24] The action of the bankruptcy court should be sustained and the appeal of Jandrain rejected. The conclusions of law have been reviewed *de novo*. The

findings of fact have been reviewed for clear error. I find no error, let alone clear error. I have provided additional reasons why the objections of the trustee should be sustained. There is no need for oral argument.

[¶ 25] Now, therefore,

[¶ 26] IT IS ORDERED, as follows:

1) The order of the bankruptcy court sustaining the objections of the trustee to the creditor's claim of James Jandrain is affirmed.

2) The objections of the trustee are sustained.

3) The appeal is dismissed.

4) The request for oral argument is denied.

[¶ 27] Dated this 22nd day of August, 2006.